454 F.2d 9
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of Richard Joyce SMITH, Trustee of the Property of
the New York, New Haven and Hartford Railroad
Company, Debtor, Appellant in No. 71-1405.
Appeal of The FIDELITY BANK and Joseph F. McDonald, as
Trustees under the Divisional First Mortgage dated as of
December 31, 1968 of Penn Central Company (Now Penn Central
Transportation Company, the Debtor), Appellants in No. 71-1445.
 Nos. 71-1405, 71-1445.
United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1971.
Decided Jan. 4, 1972.
 
 Joseph Auerbach, Sullivan & Worcester, Boston, Mass. (James Wm. Moore, New Haven, Conn., Jas. Murray Howe, Morris Raker, Boston, Mass., Tate & Ervin, Philadelphia, Pa., on the brief), for appellant Richard Joyce Smith.
 John N. Schaeffer, Jr., Philadelphia, Pa. (Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellants Fidelity Bank and Joseph F. McDonald.
 James E. Howard, Philadelphia, Pa. (Robert W. Blanchette, Marvin Comisky, Philip C. Patterson, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., on the brief), for appellees Trustees of Property of Penn Cent. Transp. Co.
 Before HASTIE, ADAMS and MAX ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 In this case, we are presented with three issues for resolution. First, does the court in railroad reorganization proceedings under section 77 of the Bankruptcy Act, 11 U.S.C. Sec. 205 (1964), have the power to order that proceeds from the sale of mortgaged properties be placed in a central depository rather than be placed in accordance with the terms of the mortgage agreements? Second, assuming that the reorganization court has the power to order the deposit of proceeds of the sale of mortgaged properties contrary to the terms of the mortgage agreements, what are the applicable standards under the Bankruptcy Act which should guide the court in this regard? And third, has the reorganization court complied with such standards here.
 
 I. FACTS
 
 2
 The facts of this case are essentially undisputed. On November 13, 1970, the trustees of the property of the debtor Penn Central Transportation Company (Penn Central Trustees) petitioned the reorganization court for authority to sell nine parcels of real estate, each sale exceeding $100,000 in amount.[1] Six of the parcels had been acquired from Richard Joyce Smith, trustee of the property of the New York, New Haven and Hartford Railroad Company (New Haven Trustee) in connection with Penn Central's acquisition of New Haven's assets and operations. See New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Pursuant to orders of the Interstate Commerce Commission and the court supervising the reorganization of the New Haven Railroad, all of New Haven's real estate acquired by Penn Central was impressed with the lien of a Divisional First Mortgage (mortgage) securing an issue of Penn Central Divisional First Mortgage Bonds (bonds)[2] issued to the New Haven Trustee as a part of the consideration for the transferred property.[3] The mortgage agreement names the Fidelity Bank and Joseph F. McDonald as indenture trustees (indenture trustees). The terms of the mortgage specify that the proceeds of the sale of properties subject to the mortgage are required to be deposited with the indenture trustees.[4]
 
 
 3
 The petition of the Penn Central Trustees requested that the nine parcels be conveyed free of lien, that the liens to which the property had been subject attach to the sale proceeds, and that the net sale proceeds be deposited in the registry of the reorganization court. The New Haven Trustee opposed any deposit of proceeds other than with the indenture trustees.[5] The reorganization court questioned the advisability of utilizing the court registry because of the accounting burden that would be placed on the clerk of the Court. Thereupon the Penn Central Trustees proposed that a single bank account be opened into which the proceeds from all sales of property in excess of $100,000 would be deposited without regard to which of the mortgages the proceeds were subject.[6] The Penn Central Trustees suggested that the Girard Trust Bank be named as the central depository. At a further hearing in the reorganization court appellants and other indenture trustees objected to such an arrangement for a variety of reasons.
 
 
 4
 On March 23, 1971, the reorganization court entered Orders No. 192 and 193 directing that a common bank account be established with the Girard Trust Bank, into which would be deposited the proceeds of the nine parcels of real estate in controversy here as well as the proceeds of all future sales of Penn Central properties in excess of $100,000.[7] Order No. 192 directed that the proceeds be invested in either certificates of deposit of any bank or trust company or short term securities of the United States Government. The appellants, the New Haven Trustee and the Indenture Trustees, have asked that we reverse these orders.
 
 
 5
 II. JURISDICTIONAL BASIS FOR EXERCISE OF POWER BY REORGANIZATION COURT
 
 
 6
 The jurisdictional basis for the reorganization court's control over the property of a debtor is found in section 77(a) of the Bankruptcy Act.[8] This jurisdiction applies to all property of the debtor regardless whether it is subject to a lien. Section 77(o) of the Act grants the court specific power to order the sale of property free of liens and to dispose of the proceeds in the manner the court determines proper.[9] Early in the judicial history of section 77, the Supreme Court clearly held that abrogation of a power of sale provision in a pledge agreement by a bankruptcy court did not violate the Due Process Clause of the Fifth Amendment. Continental Illinois Bank and Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 680-681, 55 S.Ct. 595, 79 L.Ed. 1110 (1935); accord, New Haven Inclusion Cases, 399 U.S. 392, 419-421, 90 S.Ct. 205, 26 L.Ed.2d 691 (1970). See also, Van Huffel v. Harkelrode, 284 U.S. 225, 227, 52 S.Ct. 115, 76 L.Ed. 256 (1931).
 
 
 7
 The indenture trustees here do not challenge the authority of the reorganization court to order the sale of the property. Rather, they are attacking the orders on the ground that the reorganization court exceeded its power under the circumstances here only insofar as the orders require the deposit of the proceeds in a central depository. However, section 77(o), in providing that "[t]he judge may order the trustee or trustees of the debtor to deposit such proceeds with any mortgage trustee entitled thereto . . .", impliedly grants the judge discretion to order the debtor's trustees to deposit the proceeds of sale of mortgage property elsewhere. In the New Haven Inclusion Cases, supra, the Supreme Court recognized that the power of the reorganization court was "broad and general" and that the court had "power appropriate for adjusting property rights in the railroad debtor's estate . . ." 399 U.S. at 421, 90 S.Ct. at 2073. Accordingly, we hold that the reorganization court possessed the necessary authority validly to order the creation of a central depository to hold the proceeds of real estate sales.[10]
 
 III. APPLICABLE STANDARDS
 
 8
 Holding that the reorganization court had power to issue the challenged orders, however, does not terminate our inquiry. Section 77(o), by providing that orders entered pursuant to it are final for the purposes of appeal, clearly contemplates that meaningful judicial review of such orders may be obtained. It thus follows that the power of the reorganization court is not absolute. Since the provision of section 77(o) which is controlling here vests discretion in the reorganization court, we may apply traditional standards and reverse that court only if it has abused its discretion. The Supreme Court, in the New Haven Inclusion Cases, supra, 392 U.S. at 435, 90 S.Ct. at 2081, restated the test previously established:
 
 
 9
 "'It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end.' Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S., at 564 [63 S.Ct. 727, 87 L.Ed. 959]."
 
 
 10
 Of course, the test should not be applied in a vacuum. In evaluating whether "there is warrant for the action of the District Court", we must keep in mind, in addition to the fact that certain valuable property rights are being adjusted, the underlying philosophy of the Act in question. "After 35 years of Sec. 77, as amended, it is unnecessary to recanvass the two basic objectives of the statute-the conservation of the debtor's assets for the benefit of creditors and the preservation of an ongoing railroad in the public interest." New Haven Inclusion Cases, supra, at 431, 90 S.Ct. at 2078.[11] If there is support in the record that the orders of the reorganization court fulfill the purposes of the statute, then the actions of that court must be sustained.
 
 IV. COMPLIANCE WITH APPLICABLE STANDARDS
 
 11
 The appellants contend that the reorganization court has abused its discretion in that the orders have materially and adversely affected the rights of the bondholder under the mortgage without the justification of conferring corresponding benefits upon Penn Central. The justification put forth by counsel for the Penn Central Trustees at the hearing below was simple and straightforward: "[T]he suggestion is that the court keep the money in its registry so it would be readily available for the disposition without any problems of having objection raised by others or having some other jurisdiction perhaps take hold of it or having long, drawn-out proceedings." The Penn Central Trustees contemplated that under this arrangement the "trustees would designate to the clerk of the court investments" to be made with the proceeds; "the clerk would act simply as a conduit . . ., but the trustees would designate to him the nature of the investments."
 
 
 12
 Appellants assert that at least six adverse consequences would flow from such a procedure: (1) the creation of an issue in future litigation involving unsecured creditors of Penn Central that the arrangement "caused a lapse and loss of the Mortgage lien"; (2) the bondholder's right to have an accounting at all times has been lost, and he is subjected to the need to audit the common account and possibly to contest "decisions made by the depository and by the Penn Central Trustees of how to treat the proceeds of sales of particular property or investments thereof in the context of 29 different mortgages"; (3) the bondholder "is required to accept investment management by a stranger to him"; (4) the bondholder has lost the right to the full benefits of the proceeds of investment and will be "forced to accept average rates of return and participating in an 'investment pot"'; (5) the bondholder has lost his right to be assured that the release of deposits "will be administered by the Indenture Trustees in accordance with the Mortgage"; and (6) the bondholder has been subjected to expensive burdens which would normally be assumed by the indenture trustees, and will have to assume "a burden of inquiry in [all] future petitions by Penn Central Trustees for takedowns from the common depository", whereas otherwise he would only be concerned with takedowns of deposits with his indenture trustees.
 
 
 13
 The Penn Central Trustees have countered that these objections have no sound basis. As to the first contention-possible litigation to determine whether the liens have lapsed-we agree that this in terrorem argument is speculative and that the appellants are adequately protected by the terms of the orders. We do not agree, however, that the other objections may be summarily rejected as being "without merit." These objections outline what amounts either to the creation of real hazards to the security of the debt or to the imposition of additional burdens upon the administration of the security under the mortgage indenture, and some of the burdens may be chargeable to that estate.
 
 
 14
 A most serious problem with the arrangment ordered by the reorganization court is that nine groups of indenture trustees under 29 separate mortgage agreements will probably feel compelled to litigate every future takedown petition by the Penn Central Trustees, whereas otherwise only the indenture trustees directly affected by a given taken down petition would litigate.[12] This state of affairs would complicate rather than simplify future proceedings. Of course, this situation does not impose insurmountable problems to the course of reorganization, but it does not appear that the slight procedural advantages Penn Central would gain offset the prejudice inflicted upon the appellants.[13]
 
 
 15
 Another serious drawback to the utilization of the central depository is that such an arrangement might increase the charges to the debtor's estate for the accounting and auditing of the funds so deposited. Orders No. 192 and 193 do not relieve the indenture trustees of their fiduciary responsibilities to the bondholder. Such indenture trustees would still be required to account for the funds and might be held responsible if omissions on their part resulted in detriment to the bondholder's security. Therefore, they undoubtedly would have to continue to maintain their own accounts and would have to audit accounts kept by Penn Central and the central depository.[14] It appears-although we are not so deciding-that all of these expenses would be chargeable to the estate in addition to the costs of maintaining and accounting for a central depository.
 
 
 16
 The appellants have asserted that they have been adversely affected because they have been deprived, in favor of a stranger, of their bargained-for right to have the indenture trustees manage investment of the funds deposited as security for the underlying debt. The Penn Central Trustees argue that this contention has no merit because "to the average bondholder, the Fidelity Bank and Joseph F. McDonald are just as much strangers as the Girard Trust Company." But this contention overlooks the fact that the "average bondholder" here is the only bondholder. Therefore, the basic assumption behind Penn Central's conclusion-that the bondholder who purchased his bonds on the open market did not bargain for the indenture trustees-is not necessarily valid.
 
 
 17
 The significance of who manages the investments resides in the fact that secured creditors are entitled to receive interest on their claims after the filing of a Chapter X petition if the value of the collateral exceeds the unpaid balance of the debt, if the income from the collateral equals or exceeds the interest payable on the instrument, or if a surplus exists. See Nicholas v. United States, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966); Sexton v. Dreyfus, 219 U.S. 399, 31 S.Ct. 256, 55 L.Ed. 244 (1911). Whether income in excess of the interest is earned is a matter which might well depend upon the management of the investments.
 
 
 18
 Appellants further argue that they would be deprived of the right to obtain the full value of proceeds of the investment of deposits and instead would receive a share of an average rate on the total return.[15] This situation would be further exacerbated because they would have no control over the timing or nature of the investments. The contention of the Penn Central Trustees that the loss of any such proceeds in a particular case would be de minimis and would be offset by other de minimis gains is syllogistic at best, and misses the point that the bondholder bargained with the indenture trustee to obtain this benefit on an individual basis.
 
 
 19
 The Penn Central Trustees contend that the establishment of a central depository was justified by the exigencies of this complex reorganization, setting forth numerous reasons why this arrangement is administratively necessary. They assert that to have the sale proceeds deposited in separate banks in various locations would be unnecessarily confusing, that the funds are subject to liens of higher priority than those of the indenture trustees, because of the issuance of trustees' certificates, and that the policing, supervision, and inspection of the accounts would be impeded. They also claim that some banks might refuse to obey turnover instructions necessitating plenary actions, that the reorganization court would lose control of funds belonging to the estate thus increasing the risk of dissipation, that the expense of policing would preclude any cost savings, and that economies could be effected if the funds were consolidated. However, the record before us does not support these concerns regarding the administration of the funds, and the objectives sought by the Penn Central Trustees possibly could be met by other less drastic arrangements.[16]
 
 
 20
 In an attempt to demonstrate that the procedure utilized by the reorganization court is reasonable, the Penn Central Trustees point out that a single depository, the registry of the court, was utilized during the New Haven's reorganization. However, in that case all the parties agreed to that arrangement. Furthermore, the financial structure of the New Haven was far simpler than that of the Penn Central. There, only three issues of mortgage bonds were outstanding, and no question existed as to their priorities. In any event, all of those bondholders possessed junior equities, and were therefore not vitally concerned as to the source of funds from which the debtor might obtain money required for operational expenses.
 
 
 21
 The heart of the matter is that although the Penn Central Trustees have attempted to justify the orders on the grounds of "efficiency, economy and security," in that commingling of the proceeds of the sale of property under any of the mortgages would prevent "fragmented administration" and disobedience to "turnover directions by the Court," and would lessen the risk of "dissipation" of the assets and "the expense of policing and inspection," such assertions are not adequately supported by evidence in the record. Thus, one of the purposes of the statute-"conservation of the debtor's assets for the benefit of creditors"-has been de-emphasized although it has not been demonstrated that the other purpose-"preservation of an ongoing railroad"-has been realistically furthered. We hold, therefore, on this record, that the reorganization court was not justified in ordering the establishment of a central depository in derogation of appellants' contract rights under the mortgage indenture.
 
 
 22
 Accordingly, Order No. 192 and paragraph 2 of Order No. 193 of the reorganization court will be reversed and the cause remanded for action consistent with this opinion. And in any event, our disposition of this matter is without prejudice to the filing at some appropriate time in the future of another petition to establish a central depository or some other arrangement should a demonstrable need for such a depository or other arrangement arise.
 
 
 
 [1]
 Under Reorganization Court Order No. 78, the court granted Penn Central's petition for authority to convey property sold for less than $100,000 free of lien without specific court approval of each transaction if such sales met the standards of the applicable mortgage indenture and the proceeds of the sales were deposited in accordance with the controlling mortgage agreement
 
 
 [2]
 The aggregate principal amount of the bonds was originally $34,025,800
 
 
 [3]
 The New Haven trustee is the sole holder of the bonds issued subject to the mortgage
 
 
 [4]
 See n. 1, supra
 
 
 [5]
 At the hearing on the petition, no questions were raised as to the power of the reorganization court to approve the sales or as to the adequacy of the consideration to be received by the Penn Central trustees for the properties
 
 
 [6]
 It appears that this case will affect nine groups of indenture trustees who are responsible under 29 separate mortgage bonds securing an aggregate debt of approximately $690,000,000. Although this appeal involves only the named appellants, there is an indication in the record that the appellants here reflect the consensus of interest of all nine groups of indenture trustees. Counsel for all indenture trustees were present at the proceedings before the reorganization court and sought to intervene
 
 
 [7]
 Order No. 192 placed the burden of accounting for and maintenance of the separate interests in the common account upon Penn Central. They were directed to file monthly statements with the reorganization court and the respective mortgage indenture trustees
 
 
 [8]
 ". . . If the petition [for reorganization] is so approved, the court in which the order is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located, and shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a court of the United States would have had if it had appointed a receiver in equity of the property of the debtor for any purpose. . . . " 11 U.S.C. Sec. 205 (a) (Supp.VI. 1970)
 
 
 [9]
 ". . . The judge may order and decree any sale of property, whether or not incident to an abandonment, under this subsection at public or private sale and subject to or free from liens. The proceeds derived from any such sales shall be received by the trustee or trustees subject, in case the property was sold free from lien, to any liens thereon at the time of sale, and shall be applied or disposed of in such manner as the judge by further order shall direct. The expense of such sale shall be borne in such manner as the judge may determine to be equitable. The judge may order the trustee or trustees of the debtor to deposit such proceeds with any mortgage trustee entitled thereto, to be applied in payment of all or part of such mortgage." 11 U.S.C. Sec. 205(o) (1964)
 
 
 [10]
 In Chapter X reorganizations, the remedial and procedural rights of secured creditors are subject to modification, provided that such modification does not violate the creditors' Fifth Amendment rights. See Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 470, 57 S.Ct. 556, 81 L.Ed. 736 (1937). However, a substantial impairment of secured creditors' rights would be unconstitutional, particularly if not justified by facts of record. See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935)
 
 
 [11]
 The public interest is of particular importance in this reorganization for several reasons. The maintenance of the Penn Central as an operating railroad is a matter of serious importance to the nation's economic well-being and physical security. Millions of private individuals as well as most financial and eleemosynary institutions, have invested in this railroad and are entitled to protection. Also, the federal Government has guaranteed loans made by the trustees of the railroad, and if there is a default, the public well bear the ultimate burden of repayment
 
 
 [12]
 Normally, railroad mortgages are openended, allowing property covered by the mortgage to be sold and replaced by other property of equal value. When property is sold but not replaced, the mortgage lien attaches to the sale proceeds, which are then deposited with the indenture trustee as security for the debts; the railroad has access to such money or other such proceeds only if the utilization it contemplates complies with the terms of the mortgage indenture. Expenditures for improvements and betterments are generally provided for under the indenture because they are subject to the lien of the mortgage. During reorganization, the supervising court has the power under appropriate safeguards to authorize the railroad trustees to take down for operational purposes funds held as security by the indenture trustees. See Central R. Co. of N. J. v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir. 1970). Because such use of the moneys directly affects the security for the underlying debt, indenture trustees frequently resist such takedowns in order to protect the interests of the bondholders. See generally Note, Interim Financing Through Used Turnover Power in Railroad Reorganizations, 71 Yale L.J. 1553 (1962). Although only the directly affected indenture trustees would oppose a takedown for operating expenses of funds deposited with them, under the central depository arrangement, all nine groups of indenture trustees under their respective mortgage agreements, would have an interest in the common account requiring protection
 
 
 [13]
 It is argued that the advantage to the Penn Central Trustees is that the indenture trustees, under the central depository arrangement, would not have custody of the funds, and would have to post a bond every time they desired to stay takedown orders of the reorganization court pending appeal. The hazards, on the other hand, were frankly recognized by the reorganization court: "THE COURT: You would agree that the bondholders [in the case of Central R. Co. of N. J. v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir. 1970)] got a rather empty victory in the Court of Appeals."
 Similarly, appellants argue that the bondholder will be deprived of his assurance that the indenture trustees will release deposited funds only in accordance with the mortgage; namely only for improvements and betterments which would then secure the debt, or for operations only after exerting every possible effort to protect the bondholder's position. This, too, indicates that commingling of the proceeds of sales under under all of the mortgages would further complicate subsequent litigation which would arise during the course of the reorganization.
 Penn Central, as further justification for the order, has raised the specter that not all of the indenture trustees are subject to the jurisdiction of the reorganization court, and that if they refused to obey takedown orders, plenary suits in other courts may have to be instituted to compel compliance. Even assuming that counsel's statement that he represented the interests of all indenture trustees would not bind the others to his further statement "that we have submitted ourselves to the jurisdiction of this Court . . .", the appellant indenture trustees in No. 71-1445 are clearly within the jurisdiction of the court. Therefore, the fear of future plenary actions is not justification, by itself, for including appellant within the scope of Order No. 192.
 
 
 [14]
 It seems anomalous that the debtor is being given the responsibility in the first instance for accounting for and management of the creditor's security
 
 
 [15]
 For example, assume that the proceeds from a given sale of mortgaged property amounted to $1,000,000, and that it would be possible to invest that sum at 7%. If, some months later, another parcel of property to which a different mortgage applies is sold for $10,000,000, and the latter sum can be invested at only 5% interest, then under the central depository arrangement, the benefit to the first indenture trustees would be only oneeleventh of the interest yield on $11,000,000 at an average rate of return of 5.18%, rather than all of the interest yield on $1,000,000 at 7%. Over the period of a year, this would amount to a dollar loss of $18,182 to the first indenture trustees
 
 
 [16]
 For example, it appears that if the proceeds were deposited in 29 separate accounts, under the exclusive control of the respective indenture trustees, in one bank within the jurisdiction of the reorganization court, the interests of all parties could be accommodated. The indenture trustees would be free to invest the funds as they deem appropriate, subject to court approval. Accounting functions could be assumed by one representative selected by all the indenture trustees, and the imposition of the requirement that the securities in which funds are invested be kept in safe deposit boxes in that bank would simplify a number of the problems referred to by the Penn Central Trustees
 Another arrangement would be for the district court to require that all the funds be deposited or invested within the Eastern District of Pennsylvania but to allow the indenture trustees freedom to choose the bank or banks with which they will deal.