In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor (six cases).

Appeal of MANUFACTURERS NATIONAL BANK OF DETROIT, Indenture Trustee under the Lake Shore Collateral Indenture, in Nos. 78–1699, 78–1700 and 78–2315.

Appeal of WILMINGTON TRUST COMPANY, as Successor Indenture Trustee under the New York Central and Hudson River Railroad Company, Michigan Central Collateral Indenture dated April 13, 1898, in Nos. 78–1703, 78–2311 and 78–2312.

Appeal of Charles S. JEFFREY, a holder of The New York Central and Hudson River Railroad Company 3½% Michigan Central Collateral Bonds, in Nos. 78–1702, 78–2319 and 78–2320.

Appeal of ERIE AND KALAMAZOO RAILROAD COMPANY, in No. 78–1710.

Submitted Under Third Circuit Rule 12(6) Oct. 16 and 17, 1978.

Appeal of IRVING TRUST COMPANY, as Indenture Trustee, in Nos. 78–1698 and 78–2314.

Appeal of The MAHONING COAL RAILROAD COMPANY and The Mahoning and Shenango Valley Railway Company, in No. 78–1711.

Submitted Under Third Circuit Rule 12(6) Oct. 16 and 17, 1978.

Nos. 78–1698 to 78–1700, 78–1702, 78–1703, 78–1710, 78–1711, 78–2311, 78–2312, 78–2314, 78–2315, 78–2319 and 78–2320.

United States Court of Appeals, Third Circuit.

Argued Oct. 16 and 17, 1978 (except where otherwise noted).

Decided Jan. 11, 1979.

Rehearing Denied in Nos. 78–1699–1700, 78–1703, 78–2311–12 and 78–2315 February 26, 1979.

J. Donald McLeod, John J. Iseman, Dahlberg, Mallender & Gawne, Detroit, Mich., for appellant Manufacturers Nat. Bank of Detroit, Nos. 78–1699, 78–1700 and 78–2315.

Richard G. Elliott, Jr., Michael A. Meehan, Richards, Layton & Finger, Wilmington, Del., for appellant Wilmington Trust Co., Nos. 78–1703, 78–2311 and 78–2312.

H. Theodore Cohen, Mary Ellen Neylon, Tyler & Reynolds & Craig, Boston, Mass., for appellant Charles S. Jeffrey, Nos. 78–1702, 78–2319 and 78–2320.

Steven R. Rivkin, Washington, D. C., for appellant Erie and Kalamazoo Railroad Co., No. 78–1710.

Stephen A. Weiner, Winthrop, Stimson, Putnam & Roberts, New York City, for appellant Irving Trust Co., Nos. 78–1698 and 78–2314; David M. Payne, Frederick I. Miller, New York City, of counsel.

Frank Buckhout McShane, Frederick J. Berman, Walsh & Frisch, New York City, for appellant Mahoning Coal Railroad Co., etc., No. 78–1711.

Carl Helmetag, Jr., James E. Howard, John J. Ehlinger, Jr., Philadelphia, Pa., Charles A. Horsky, W. Crosby Roper, Jr., Brice M. Clagett, Washington, D. C., Covington & Burling, Washington, D. C., for appellees, Trustees of Penn Central Transp. Co.; Covington & Burling, Philip R. Stansbury, Wesley S. Williams, Jr., Wynne M. Teel, Washington, D. C., of counsel.

Kenneth M. Kramer, Robert H. MacKinnon, George J. Wade, Shearman & Sterling, New York City, for Citibank, N.A.

Louis A. Craco, Richard L. Posen, Willkie Farr & Gallagher, New York City, Frederic L. Ballard, Vincent P. Hatton, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellee, Institutional Investors Penn Central Group; Walter H. Brown, Jr., Thomas L. Bryan, Michael B. Targoff, Debra M. Evenson, New York City, of counsel.

Michael L. Temin, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellees, Metropolitan Life Ins. Co., et al.

Spencer Ervin, Jr., Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., Morris Raker, Sullivan & Worcester, Boston, Mass., for appellee, Richard Joyce Smith; Joseph Auerbach, Boston, Mass., of counsel.

Walter C. Kelley, Donald B. McCann, Margaret Anne Foster, Kelley, McCann & Livingstone, Cleveland, Ohio, for Board of Ed., Cleveland City School Dist., as amicus curiae.

Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

We have before us numerous appeals from the Penn Central Transportation Company reorganization court's orders of approval, confirmation and consummation of a Plan of Reorganization. Satisfied that the Plan is fair and equitable as to these appellants, we affirm.

Plans of reorganization for Penn Central and for fifteen secondary debtors (collectively, The Plan) have been approved by the reorganization court, and upon submission to claimants for a vote, have been accepted by an overwhelming majority of claimants. Related appeals also decided this day are *In the Matter of Penn Central Transportation Company, Debtor, (Irving Trust and Bank of New York Appeals)*, 596 F.2d 1102 (3d Cir. 1979); *In the Matter of Penn Central Transportation Company, Debtor, (Stockholder Appeals)*, 596 F.2d 1155 (3d Cir. 1979). These appeals present issues which require us to review the basic framework of the monumental plan designed to resolve what may be the most complex set of interrelated and conflicting claims ever addressed under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205.

The questions for decision are:

1. Whether the Plan, in providing Series A preference stock to certain bondholders whose mortgage liens were recognized by the reorganization court to have somewhat superior coverage (the so-called "super-secured" creditors), adequately provides for them.

2. Whether the Plan properly excludes certain bond issues from that "super-secured" class.

3. Whether the Plan adequately protects the interests of the Erie and Kalamazoo Railroad Company, a non-bankrupt leased line of Penn Central.

The history of this reorganization proceeding and the characteristics of the Plan are set forth in an extensive opinion by the Honorable John P. Fullam, judge of the reorganization court, 458 F.Supp. 1234 (E.D. Pa.1978). To put in proper perspective the nature of these appeals, it is necessary to understand the theory of the Plan, and to understand this theory it is first necessary to review the history which forms the backdrop for this mammoth reorganization.

## I.

Penn Central Transportation Company (PCTC), the debtor, was formed in 1968 by the merger of the Pennsylvania Railroad Company and the New York Central Railroad Company. The "Pennsy" and the New York Central can be traced almost to the beginning of railroad transportation in the United States. By the 1870's they had created, by construction and purchase, railroad systems extending from the eastern seaboard to the Mississippi River. In spite of the difficulties facing the rail industry in the 1930's, both railroads, because of their financial strength, were able to function as viable, successful companies. Both systems had been created in large part through lease or purchase of stock of a large number of separate railroad companies, many of which had substantial amounts of their own securities outstanding. Both legal and financial obstacles made it difficult to change the original relationships and subsequently added to the complexity of the Penn Central reorganization.

The Interstate Commerce Commission conditioned its approval of the merger between the Pennsylvania and New York Central railroads on the acquisition of the New York, New Haven and Hartford Railroad Company (New Haven) by the newly formed Penn Central. The New Haven, a system in southern New England with many operating relationships to the merged companies, had been in reorganization proceedings under Section 77 of the Bankruptcy Act since 1961.

There is some suggestion in *The Financial Collapse of the Penn Central Company,* Staff Report of the Securities and Exchange Commission to the Special Subcommittee on Investigations (August 1972) (SEC Report), that the Pennsylvania-New York Central merger may not have been realistically planned:

No consideration was given in connection with this merger to the broad question of realinement of the Eastern roads or whether this was the best merger for the two roads. They were, in effect, the leftovers, after other combinations had been individually arranged. Furthermore, little consideration appears to have been given to the question of whether this particular merger would work at all. Certainly the combination of two already ailing and financially weak roads raises questions as to feasibility and in this situation the possibility also existed that the size and complexity of the merged company would preclude manageability.

SEC Report, *supra,* at 17. Additionally, whatever flaws were inherent in the plan to merge were exacerbated by ICC requirements and labor difficulties:

By the time ICC's approval was obtained, two decisions had been made which many people have suggested sealed the doom of the company. Neither had been contemplated at the time of the original proposal. First, in May 1964, the two roads reached an accord with labor, the Merger Protective Agreement, whereby they, in effect, bought the cooperation of

the unions, which had been opposing the merger. The result of this agreement would be to cause the company to incur costs far above those anticipated in the Patchell report and thus limit the savings projected. The second factor was the decision of the ICC to force the New Haven Railroad on the Penn Central, adding still a third financially and operationally weak road to the group.

*Id.,* at 18. When merger was completed, the initial expectation that increased size would bring with it increased efficiency and profits began to fade into the dismal reality of misrouted cars, management problems, uncertainty of internal procedures, deterioration of the physical plant, and high-level in-fighting. An officer of the company, in a speech to a group of shippers in March 1969, described one aspect of the operations problem as follows:

> ·This period of transition from two railroads to one harmonious system has not been easy. One of the reasons for our difficulty can be found in the size of the plant itself. While our lines paralleled each other in a number of areas and we shared many common points, the Pennsylvania and New York Central systems were not complementary. Our separate yards did not have the individual capacity to handle the combined business of the two railroads, and we have had to keep several yards in operation until combined facilities can be built.

> Our separate communications systems were not compatible and this complicated some of the service problems created by the merger. This situation has been aggravated by confusing routing symbols, particularly from off-line sources. For example, a car routed Penn Central-Cincinnati that should have gone to the former Central yard in Cincinnati often has ended up in the old Pennsylvania yard and frequently its waybill papers went astray as well. In addition, employees of the former Pennsylvania were not familiar with the properties and procedures of the former New York Central, and vice versa. A great deal of cross-pollination

had to take place in the process of finding the most efficient way to handle traffic.

. . . . .

·An internal memorandum prepared about the same time and intended for use by top-level management personnel as a ·basis for response to numerous press inquiries about the road's "lousy" freight service relates the following:

> From the beginning of merger discussions it was recognized that it would be necessary to continue parallel operations over the lines of the two former railroads until terminals could be integrated, connections constructed, and yards expanded along principal routes. Before the merger was consummated, arrangements were made with our principal connecting carriers that blocking of traffic and interchange would continue as before merger, with gradual changes to be made as construction and operational arrangements were completed to permit integration on an orderly basis. For a while following merger, operations were maintained in accordance with this plan, and deterioration set in only when there was a relaxation in the preclassification and delivery arrangements at major gateways, such as St. Louis and Chicago. The problem was unintentionally compounded when shippers began to route their freight "PC" rather than via "PNYC(P)" or "PNYC(N)" thereby failing to direct their traffic to one or the other of the former railroads.

> The principal effect of these changes was to create congestion and confusion at major gateways and to shift the classification functions of those terminals to internal yards, thus spreading the congestion eastward. This initial disruption triggered a number of collateral effects: it widened the margin for error by clerical personnel who were unfamiliar with stations and consignees to which they were routing traffic; it disrupted the cycling of locomotives and thereby produced sporadic power shortages; it placed an unman-

ageable tracing demand upon a data processing system already beset with the problems in incompatibility; it caused separation of cars from billing as emergency steps were taken to clear congested yards; it prompted short-hauling of Penn Central, thereby increasing the switching burden at interchange points with other eastern carriers—and as these adversities snowballed one after another the speed and reliability of our service deteriorated steadily.

*Id.,* at 21–22 (footnote omitted). In sum, the merged railroad faced operational, financial and management problems which, in large part, were not anticipated and which ultimately led to its collapse.

Notwithstanding these difficulties, the annual reports for 1968, 1969 and 1970 were misleadingly optimistic, according to the SEC Report:

As we review the disclosure history of Penn Central, we get a picture of high euphoria and inflated prospects about the savings to be achieved by the merger with the manifest difficulties ignored or overlooked. When these difficulties emerged as painful realities, they were inadequately disclosed. The annual reports put out for 1968, 1969, and 1970 obscured the railroad's further movement into debt amid mounting operating losses. Instead they emphasized that efficiencies, improvement in service, and new exciting revenue sources were just around the corner.

. . . . .

The staff report shows that as both the operating and liquidity condition of Penn Central deteriorated, its management made increasingly strenuous efforts to make a bad situation look better by maximizing reported income. An elaborate and ingenious series of steps was concocted to create or accelerate income, frequently by rearranging holdings and disposing of assets, and to avoid or defer transactions which would require reporting of loss. Accounting personnel testified that they were constantly under intense pressure from top management to accrue revenue optimistically and under-accrue expenses, losses, and reserves, to realize gain by disposing of assets and to charge losses to a merger reserve which would not take them through the income statement. Gains were reported on real estate transactions in which the realization of benefits to the company depended on operating results far into the future and in which there was little if any real change in the character or amount of assets owned by Penn Central.

*Id.* at ix-x. An already complex situation was further complicated in 1969 by a second merger: the Penn Central Company, which had operated the merged Pennsylvania and New York railroads, was renamed Penn Central Transportation Company and became a wholly owned subsidiary of a new holding company, the Penn Central Company. In other words, the old Penn Central Company was renamed Penn Central Transportation Company and the new holding company took over the subsidiary's old name, Penn Central Company. The purpose of the reorganization was to facilitate diversification and consolidation of the railroad business.

By 1970, PCTC had reached the point where it could no longer raise the money to pay the escalating cash losses incurred in its operations. In retrospect, it had been relying upon use of short term credit to pay its cash deficits in the expectation that the projected merger savings would restore its financial health. The short term borrowings were about at the half billion dollar level; the immediate fruit of the merger was expensive new problems, well publicized; and its 1969 financial statements, once analyzed, indicated that the financial results of operations were rapidly deteriorating rather than improving. After an unsuccessful attempt to secure government financing, PCTC sought relief under the Bankruptcy Act. The 1968 and 1969 mergers, the inclusion of the New Haven, already in reorganization, and the complex capital structures of the merged railroads has required the reorganization court to

deal with a bewildering number of companies and security issues.

### A.

On June 21, 1970, two years after the merger of the Pennsylvania and New York Central railroads, Penn Central filed a petition for reorganization under Section 77 of the Bankruptcy Act. At that time, the merged system had approximately 40,000 miles of track in sixteen states, the District of Columbia and two Canadian provinces. Since its inception, the bankruptcy of the Penn Central and the subsequent reorganization proceeding have been different from all prior railroad reorganizations. *In re Penn Central Transportation Co.,* 384 F.Supp. 895, 902 (Sp.Ct.1974) (180–Day Appeals). Whereas earlier railroad insolvencies had typically been caused by inability to meet fixed charges or debt maturities, the bankruptcies of the Penn Central and the other northeast railroads were precipitated by their inability to meet the operating expenses and taxes of their railroad business. *Id.* at 903. The collapse of their capacity to provide rail service in turn precipitated a "rail transportation crisis seriously threatening the national welfare." *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 108, 95 S.Ct. 335, 341, 42 L.Ed.2d 320 (1974) (*"Rail Act Cases"*). And this crisis in turn prompted a public response unprecedented in the long history of railroad reorganization.

For more than two years the trustees tried to reorganize the Penn Central by pressing for the realization of the conditions they deemed essential to its viability. By 1972, however, the ICC had recognized that the trustees' most recent report had constituted "a public notice that a successful reorganization of Penn Central could not be accomplished wholly within the means provided by Section 77 of the Bankruptcy Act." [1] It was becoming clear that congressional intervention would be necessary to solve the complex problems affecting Penn Central and a number of other eastern railroad systems. [2]

Various reports in February 1971, September 1971, and April 1972, by the trustees attempted to show that the system was a viable, private economic entity. The reorganization court reported:

> In February of 1973, the trustees again, eschewing nationalization, but apparently reconciled to the inevitability of delay before the conditions of viability could be achieved, concluded that plant improvement in the range of $600 to $800 million would be necessary and that the only source of this financing was the United States. Absent such capital investment, even a sharply reduced freight system would not be viable.

> The dilemma facing the trustees was that each day the estate operated additional deferred charges were accruing. Time was expensive. High administration expenses gave rise to two concerns: first, the potential economic viability of any railroad which might emerge was diminished by each increase in high-priority obligations; second, the continued accrual of administrative expenses would soon reach the point of being an unconstitutional impairment of the rights of the estate's creditors. [3]

With mounting opposition from creditors who feared the continued erosion of the estate in deficit rail operations, the trustees acknowledged in 1973 the impossibility of

---

1. Comments of the Interstate Commerce Commission on the Report of the Penn Central Trustees on Reorganization Planning, 1011 Corp. Reorg. Rep. (Penn Cent.) 2612 (March 15, 1972).

2. The Reading System, Central Railroad of New Jersey, Erie-Lackawanna Railway, Lehigh Valley Railroad, Lehigh and Hudson River Railroad, and Ann Arbor.

3. By petition dated March 16, 1973, the New Haven Trustee asked the Court to order a complete cessation of operations by October 1973. Petition of the New Haven Trustee Concerning Reorganization Planning for Penn Central, for Instructions to be Given the Trustees with Respect Thereto and as to Related Matters, 1011 Corp. Reorg. Rep. (Penn Cent.) 4568 (March 16, 1973).

reorganizing the railroad without federal aid of massive proportions.[4]

Pursuant to an order of the reorganization court, the trustees filed with the ICC on July 2, 1973 a plan of reorganization for Penn Central. The New Haven trustee and Penn Central Company also filed plans.[5] The ICC held hearings on those plans over the summer; it reported on September 28, 1973,[6] holding that because the plan of the trustees did not provide concretely for the continuation of rail services, it did not constitute a "plan of reorganization" under Section 77 of the Bankruptcy Act. Accordingly, approval of this and the other two plans was withheld. As creditors moved to dismiss the reorganization[7] or to halt rail operations,[8] Congress enacted the Regional Rail Reorganization Act of 1973 (RRRA).[9]

**B.**

The RRRA created the United States Railway Association (USRA), a federal agency, to develop plans for revitalizing railroad services in the region and to administer various grant and loan funds. Among other things, USRA was to decide which lines or parts of lines were necessary to federal reorganization. The Act also directed creation of Consolidated Rail Corporation (Conrail), a railroad company and successor to some of the routes served by the bankrupt Penn Central. The Act required the conveyance of major portions of Penn Central's rail assets to Conrail free of encumbrances, and the continuation by Penn Central of its rail operations in the interim. Although the Act contemplated that Conrail would be a corporation owned by investors rather than a federal agency, at present it is financed by the United States. Further, the Act provided that a Special Court would have original and exclusive jurisdiction to dispose of all disputes arising from implementation of the reorganization. The Supreme Court sustained the Act against constitutional challenge,[10] recognizing it as a unique extension of the bankruptcy powers of Congress.[11] The Court upheld the unconventional central provision of the Act—mandatory conveyance of the estate's rail assets before judicial approval of the terms of the transfer—in light of the assurance found in the Tucker Act, 28 U.S.C. § 1491, that full compensation for those assets would be paid.[12]

In April 1976, pursuant to court order but prior to a valuation, Conrail acquired certain of the railroad property of Penn Central. In general Conrail did not acquire lines or parts of lines which USRA considered unnecessary. Properties not acquired by Conrail were divided into two categories: lines authorized by the Act to be abandoned or scrapped, or lines which could be operated if state or local authori-

4. Trustees' Interim Report of January 1, 1973, 1011 Corp. Reorg. Rep. (Penn Cent.) 4352 (Jan. 1, 1973), and Trustees' Interim Report of February 1, 1973, 1011 Corp. Reorg. Rep. (Penn Cent.) 4446 (Feb. 1, 1973).

5. A Plan for Reorganization of Penn Central Transportation Company, Debtor, Pursuant to Section 77(d) of the Bankruptcy Act, 1011 Corp. Reorg. Rep. (Penn Cent.) 4685 (June 27, 1973); Plan of Reorganization of Penn Central Transportation Company and Certain Other Railroad Corporations, 1011 Corp. Reorg. Rep. (Penn Cent.) 4764 (Aug. 10, 1973).

6. Preliminary Report of Interstate Commerce Commission, Fin. Doc. No. 26241, 1102 Corp. Reorg. Rep. (Penn Cent.) 86 (Oct. 5, 1973).

7. Motion of the New Haven Trustee for Dismissal of the Reorganization Proceedings and Petition for Acceptance of the Within Petition as a Complaint Instituting a Civil Proceeding for Receivership of the Debtor, for Appointment of Receivers, for Cessation of Rail Operations and for Related Matters, 1011 Corp. Reorg. Rep. (Penn Cent.) 4794 (Oct. 9, 1973).

8. Statement of Position of Institutional Investors Penn Central Group and Certain Indenture Trustees in Response to Order No. 1321, 1011 Corp. Reorg. Rep. (Penn Cent.) 4798 (Oct. 12, 1973).

9. Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985 (Jan. 2, 1974); 45 U.S.C. § 701 et seq.

10. Rail Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

11. Rail Act Cases, 419 U.S. at 153, 95 S.Ct. 335.

12. Rail Act Cases, 419 U.S. at 149, 152, 95 S.Ct. 335.

ties provided for continued service, backed by a subsidy sufficient to ensure the owner against loss. It was not intended that Penn Central would resume any railroad operations.

Conveyance to USRA took place in 1976. But before the conveyance took place, Congress made a number of important amendments to the RRRA including Section 306 of the Act, which authorized the issuance of Certificates of Value, and the Section 211(h) loan program. Section 306 Certificates of Value are interest-bearing USRA securities redeemable on December 31, 1987, constituting a pledge of the United States to make up with cash any difference between the net liquidation value of the assets conveyed by Penn Central and other northeast bankrupt railroads and the value of Conrail stock and other benefits conferred on the estates by the RRRA.

The reason for the enactment of the Section 211(h) loan program was that as the time for conveyance approached, it was apparent that Penn Central's payables were in excess of its receivables. The situation was potentially tantamount to a second bankruptcy since Conrail was not to assume any liability for Penn Central's pre-conveyance obligations. Section 211(h) created a mechanism by which Conrail borrowed from USRA in order to pay certain classes of the debtor's payables. In turn, the estate was obligated to recognize as a current cost of administration the amount of 211(h) funds expended by Conrail on the estate's behalf.

### C.

An understanding of the Plan also necessarily involves consideration of the non-rail business of the estate. These substantial and profitable non-rail operations and assets held out the promise that Penn Central

could function as a non-rail enterprise. Principally, these assets included non-rail businesses operated through Pennsylvania Company (Pennco), a wholly-owned subsidiary of PCTC, and various income-producing real properties in New York City and elsewhere. In the income statements filed by the trustees for the years 1970–75, a total of $244,462,000 of non-rail income was reported.[13]

In developing a plan of reorganization which took account of these considerations, the trustees could derive guidance from two significant events involving major non-rail assets that had occurred during the course of reorganization.

### 1.

Having previously announced their intention to sell all of the Park Avenue properties in New York City, in March 1972 the trustees petitioned to sell six of them at prices aggregating $59.5 million.[14] Various creditors raised objections to that sale, arguing that the proceeds of the sale would inevitably and improperly be used directly or indirectly to support hopelessly losing rail operations, and that the possibility of an ultimate plan of reorganization for Penn Central was threatened by the divestiture of those earning assets. At that time, those assets were producing $4.4 million annually, *In re Penn Central Transportation Co. ("Park Avenue Properties")*, 354 F.Supp. 717, 750–51 (E.D.Pa.1972), *aff'd in part and rev'd in part*, 484 F.2d 323 (3d Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973), and with other non-rail properties were properly regarded as constituting the key to any attempt to formulate a plan of reorganization. The district court denied the petition in part, but approved the sale of four parcels for an aggregate of $14 million. 354 F.Supp. at 746–51. On

---

**13.** By years, the "other income" was 1970: $55,145,000; 1971: $31,373,000; 1972: $37,927,000; 1973: $38,756,000; 1974: $40,931,000; 1975: $40,330,000.

**14.** Petition of Trustees for Authority to Sell the Vanderbilt Concourse Building, Penn Cent. Doc. No. 2870 (March 13, 1972); Petition of Trustees to Sell 350 Park Avenue, Penn Cent.

Doc. No. 2871 (March 13, 1972); Petition of Trustees to Sell 280 Park Avenue, Penn Cent. Doc. No. 2872 (March 13, 1972); Petition of Trustees to Sell 280 Park Avenue, Penn Cent. Doc. No. 2873 (March 13, 1972); and Petition of Trustees to Sell 230 Park Avenue and 245 Park Avenue, Penn Cent. Doc. No. 2874 (March 13, 1972).

appeal, the creditor interests urged that a reorganization court could not approve piecemeal disposition of such non-rail assets in the context of a program to divest all major non-rail assets, and that, apart from extraordinary circumstances, no such program for divestiture of non-rail assets could be pursued except in the context of a plan of reorganization. In June 1973 this court sustained that view, holding:

> In the context of this case, if such sales are to take place, they must be made as part of a reorganization plan, approved pursuant to the provisions of sections 77(d) and 77(e).

*In re Penn Central Transportation Co., supra,* 484 F.2d at 334.

### 2.

The second major controversy involved Penn Central's ownership and pledge of the common stock of Pennco. That stock had been pledged to the Secured Bank Creditors as collateral for a $300 million pre-bankruptcy loan. In July 1972 the trustees petitioned the court to approve a settlement of the claims of the Secured Bank Creditors which provided that the common stock of Pennco would be transferred to the banks subject to conditional provisions permitting Penn Central to share in certain appreciation in value of that stock.[15] That petition was opposed upon the ground that the common stock of Pennco was essential to an ultimate reorganization and that a settlement of the kind proposed could not be carried out except in the context of a complete plan. The appropriate value of Pennco to Penn Central was also put in issue. In April 1973 the reorganization court denied the petition stating:

> In a straight bankruptcy, the relevant consideration presumably would be the price which Pennco could be sold for; that is, whether there is any "equity" over and above the banks' claims, and whether the Trustees should "disclaim." In a railroad reorganization context, how-

ever, the potential value of Pennco to the reorganized company must also be considered.

Opinion and Order No. 1189, 1011 Corp. Reorg.Rep. (Penn Cent.) 4609, 4616 (April 16, 1973).

In light of the conveyance of the rail assets and the judicial insistence that the non-rail assets should not be disposed of except as part of a plan of reorganization that would contribute the value of these assets to the entire enterprise, fresh efforts to formulate a fair and equitable plan were undertaken. These efforts were focused on an attempt to construct a plan that would take account of (1) the income-producing continuing businesses owned and managed by Pennco; (2) the cash to be generated through liquidation of non-essential remaining assets (the "asset disposition program"); and (3) the constitutionally assured expectation that a significant award would be made in the Valuation Case, understanding all the while that both the time and the amount of the award were unforeseeable. The alternative to such a plan, it was believed, would be to embark on decades of litigation, with the concomitant waste of valuable and productive assets and accrual of increasing claims. Any plan, in order to be fair and equitable to the competing claims against the estate, would also have to take into account a basic reality of this reorganization proceeding: that the validity, priority or amount of virtually every claim was under attack in one way or another.

### II.

The principal compromise settlements embodied in the Plan concern the major claims of the federal government, a consortium of New York banks and trustees of the New Haven Railroad.

### A.

The government's claims possess the questionable virtues of astronomic size and

---

**15.** Petition of the Trustees for Approval of a Settlement Agreement dated as of February 25, 1972, and the Terms and Conditions Set Forth Therein and Authority to Consummate the Transactions Contemplated by Such Agreement, 1011 Corp.Reorg.Rep. (Penn Cent.) 3472 (July 17, 1972).

statutory priority. These claims include $50 million, plus interest, due on trustee's certificates in default since 1976, approximately $350 million due or to become due under the Section 211(h) program, and the guarantee of the balance of $50 million in trustee's certificates which fall due in 1986. Under the compromise reached with the federal government, payment of the $50 million in defaulted trustee certificates is deferred until the consummation date under the Plan. All other claims are deferred until the conclusion of the Valuation Case, and the government agrees to accept the distributions provided for in the Plan, and to support the Plan. "Without such deferrals," observed the reorganization court, "there obviously could be no Plan of Reorganization, and no claims of other creditors could be paid until the Government's claims were satisfied in full." [16]

### B.

In the period between the merger in 1968 and the bankruptcy in 1970, Penn Central obtained much of its working capital by means of a short-term, revolving credit arrangement with a consortium of banks, for which Citibank acted as agent. The short-term arrangement was designed as a prelude to long term mortgage financing which did not materialize, initially because of unfavorable market conditions, and later because of Penn Central's rapidly deteriorating financial condition. A few months before bankruptcy the revolving credit arrangement was increased, with Penn Central pledging the stock of its subsidiary corporation, Pennco, to the Citibank group as collateral for a $300 million revolving credit authorization. The entire $300 million was drawn down before bankruptcy. No payments have ever been made on this indebtedness. Treated as a fully secured claim, entitled to interest at the contract rate, the claim would now aggregate more than $470 million. It is secured by the asset, Pennco, the surviving company which is absolutely essential to the success of the Plan. 458 F.Supp. at 1266.

The proposed Plan embodies a compromise resolution of many issues associated with this credit arrangement including a possible violation of Section 10 of the Clayton Act. Monumental problems are associated with this potential litigation and the Plan embodies a compromise resolution of sophisticated issues. As stated by the reorganization court: "The banks' total claim is fixed at $440 million. The banks further give up any rights they may have to assert a secured position by reason of the cash held on deposit when the bankruptcy petition was filed, or any priority arising from this Court's injunction against setoffs. With respect to the $440 million claim, the banks would receive the same treatment as other secured creditors. That is, the claim would be recognized as fully secured, but allocated as between retained and conveyed assets (61% retained, 39% conveyed)." [17]

### C.

Finally, it is necessary to consider the secured claim of the trustee of the New Haven Railroad in the amount of $208.5 million, stemming from the inclusion of the New Haven in the Penn Central merger in 1968. The price to be paid by Penn Central for the New Haven properties was finally adjudicated by the Supreme Court shortly after Penn Central filed its reorganization petition. *New Haven Inclusion Cases*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Upon remand from the Supreme Court the New Haven reorganization court imposed an "equitable lien" upon all the former New Haven assets in the hands of Penn Central. Later vacated for jurisdictional reasons, it was reinstated by the Penn Central reorganization court as "a lien, indeterminate in amount, and indeterminate as to priority, upon all the real property and readily identifiable tangible personal property (exclusive of rolling stock) . . . conveyed to Penn Central" by the New Haven trustee. *In re Penn Central Transportation Co.*, 337

---

**16.** 458 F.Supp. at 1264.

**17.** 458 F.Supp. at 1268.

F.Supp. 779, 791 (E.D.Pa.1971). The New Haven trustee also holds $34 million of Penn Central Divisional First Mortgage Bonds secured by the properties previously owned by the New Haven and has asserted various claims based upon alleged misrepresentation or fraud on the part of Penn Central's pre-bankruptcy management.

Under the settlement agreement, all of these disputes are resolved by a secured claim in the amount of $121 million and an unsecured claim in the amount of $53 million. "The settlement is well within the range of reasonably likely litigation possibilities," observed the reorganization court, "and the litigation would obviously be lengthy and expensive. It is significant that no one has expressed any objection to the settlement arrangement. I conclude it is fair and reasonable, and should be incorporated in the Plan." [18]

### III.

When the Penn Central properties were conveyed to Conrail, the parties disagreed strongly about the valuation of the property conveyed under the final system plan; they also disagreed with the valuation standards to be applied under the RRRA and about the value of the Conrail securities offered in exchange. The RRRA created a special three-judge federal court with original and exclusive jurisdiction to dispose of all disputes arising from implementation of the final system. The securities issued by Conrail were deposited in the court at the time of the conveyance, which was made pursuant to the order of the special court. Cases have been commenced in that court by representatives of the affected railroads, and by other parties to determine the net liquidation value of the property conveyed, and the "compensable unconstitutional erosion, if any" suffered during the pre-conveyance period. This is referred to as the "Valuation Case" which is an important ingredient in the final plan of the Penn Central reorganization.

The SEC reports that the book value of the property conveyed to Conrail by the Penn Central system on April 1, 1976, was approximately $3.2 billion (I, A–1124), but USRA estimated the net liquidation value of this property, discounting future liquidation proceeds to 1976 values, at some $485 million, 458 F.Supp. at 1271. It bears mention that in its October 12, 1977, valuation opinion, the special court noted: "It seems incredible that these 19,000 miles of railway and freight and passenger terminals, together with the equity in rolling stock, were worth only $685 million, the sum arrived at in the revised [Master Liquidation Plan] of March 1, 1976." [19]

It will be recalled that RRRA required Penn Central to continue operations until the federal agency decided what lines or parts of lines were necessary under the federal reorganization. The continued operations of the railroads created special problems, including some of constitutional dimensions that commanded the attention of the Supreme Court in the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The SEC reports that an analysis of the operation of Penn Central for a six-year period, 1970–1975, "shows aggregate book losses of $1.8 billion. Excluding major bookkeeping adjustments, the aggregate losses were about $1.4 billion and continued operation was financed primarily by non-payment of taxes and fixed charges, aggregating about $1.2 billion and about $190 million of special loans, including the funds drawn from affiliates. Although $600 million of book losses represented depreciation and similar non-cash items, this was more than balanced by actual expenditures, aggregating about $667 million on equipment obligations, property additions and expenditures charged to reserves. Funds placed in escrow approximately equalled the net proceeds of property sold, including the gains taken into income." [20]

18. 458 F.Supp. at 1270.

19. 458 F.Supp. at 1273.

20. I, A–1131.

Under the Railroad Revitalization and Regulatory Reform Act of 1977, certificates of value, new securities issued by USRA, are backed by the full faith and credit of the United States as a partial guarantee of the value of the Conrail securities the estates are to receive in exchange for the properties. The amended statute requires the special court to make findings as to the amount, if any, of compensable unconstitutional erosion incurred by the estates between the passage of the Act and the actual conveyance to USRA. The special court will also make findings as to the net liquidation value of the conveyed properties.

Judge Henry J. Friendly's opinion for the special court in *In re Valuation Proceedings under §§ 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, 439 F.Supp. 1351 (Special Ct.1977) (Erosion Opinion), expresses the view that "[u]nconstitutional erosion arises only when a losing business has been required to continue to operate against its will for more than a reasonable period," and that the term "against its will" means "that some identifiable agency of government having power to do so should have thwarted its desires [to cease operations]," 439 F.Supp. at 1356. Two kinds of erosion must be considered—financial erosion refers to the creation of claims against the debtor's estate which prime the claims of pre-bankruptcy creditors, both secured and unsecured; physical erosion refers to reduction in the value of the physical assets and depletion of cash. As in other aspects of these proceedings, formidable erosion claims have been asserted. For example, Penn Central asserted a claim for compensable unconstitutional erosion of approximately $900 million. *Id.* at 1354–55.

## IV.

The Plan is constructed on the basic premise that the estate is solvent. It uses as the foundation for the reorganized company Pennco, a wholly owned subsidiary of Penn Central which has substantial assets, earnings and future earning potential, enhanced by the existence of large operating loss carryforwards. Other retained non-operating assets of the debtor will be sold in the asset disposition program and the proceeds, together with the recovery in the Valuation Case, will be used to satisfy claimants. Necessarily, the Plan embodies compromises within the range of probable results of litigation of the many and varied issues legitimately in dispute.

The first, and basic, compromise is that with the Citibank consortium, the New Haven, and the United States, which had guaranteed $100 million of Trustees' Certificates. The second, and equally essential, compromise was with the multitude of state and local taxing authorities. Those authorities that did not choose to participate in an offer of early cash settlement are to be paid 44 percent of their claims in cash and early-maturing securities and the balance in notes.

In addition, the Plan reflects settlements with the "Friday Group," representing a large portion of the secured debt; with the active unsecured creditors; with Penn Central Company, the sole stockholder of Penn Central; and with the fifteen leased lines also in reorganization (the secondary debtors). The success of those compromise efforts is evident from the overwhelming votes of approval that the Plan has received.

## A.

Pursuant to these compromises, the Plan accords secured claimants 10 percent in cash on consummation, general mortgage bonds in principal amount equal to 30 percent of the claim, preference stock with a redemption value equal to 30 percent of the claim, and new common stock worth 30 percent of the claim. This is referred to as the "10 triple 30" distribution. Approximately 55 percent of the new common stock in the reorganized company will be so distributed to secured creditors.

The general mortgage bonds are in two series: A bonds, which are issued to a secured claimant in proportion to the extent his claim is secured by assets retained by the reorganized company, and B bonds,

which in general represent the portion of the claim secured by assets conveyed to Conrail. A bonds are to be redeemed out of the asset disposition program ahead of B bonds, and B bonds are to be redeemed out of Valuation Case proceeds ahead of A bonds. Preference stock, which is to be redeemed from earnings of the reorganized company after 1980 and from proceeds of the Valuation Case, if sufficient, is also divided into Series A and B. Series A, which will be redeemed before Series B, will be issued to the super-secured creditors.

Unsecured claimants will receive 35 percent of the new common stock and Certificates of Beneficial Interest payable out of Valuation Case proceeds after senior obligations have been satisfied, to the extent of 30 percent of each claim.

The stockholder, Penn Central Company, will receive 10 percent of the new common stock.

### B.

The Plans for the secondary debtors are, with certain exceptions, generally parallel to that of Penn Central.

Section 601(b)(4) of the RRRA transferred to the reorganization court all of the duties and responsibilities of the ICC as of April 1, 1976, when Penn Central transferred its rail properties to Conrail. Subsequently, the reorganization court requested and received from the SEC a thorough analysis and approval of the Plan, and a further supplemental report approving amendments which had been proposed to the Plan, reflecting the settlement reached with the state and local taxing authorities. The reorganization court adopted in substantial part the findings of the SEC reports.

After full opportunity for hearing, the reorganization court approved the Plan (with certain minor amendments which have since been incorporated in the Plan) on March 17, 1978. Judge Fullam noted that

"[l]ike all products of human endeavor, the Plan may not be perfect, but in my judgment it provides entirely fair and workable solutions to all of the complex and difficult problems confronting the Debtor's estate." On May 26, 1978, the United States Trust Company of New York, which had been designated by the reorganization court to conduct the voting on the Plan, reported that the Plans for the Penn Central and for fourteen of the fifteen secondary debtors were accepted by more than two-thirds of all classes. The fifteenth secondary debtor plan, that for the Pittsburgh, Fort Wayne & Chicago, was accepted by more than two-thirds of all classes except Class 0–2, representing the holders of common stock (54.2 percent).[21] The reorganization court confirmed the Plan pursuant to its power to do so under Section 77(e).

We turn, then, to the objections raised by the several appellants.

### V.

██ Our review of the reorganization court's approval of the Plan is limited. In a reorganization case, as in any appeal from a non-jury proceeding, we review for erroneous selection, interpretation or application of legal precepts, and for clearly erroneous findings of fact. *In re Chicago Rys. Co.*, 160 F.2d 59, 68 (7th Cir.), *cert. denied* 331 U.S. 808, 67 S.Ct. 1192, 91 L.Ed. 1829 (1947); *Comstock v. Group of Institutional Investors*, 163 F.2d 350, 357 (8th Cir. 1947), *aff'd.* 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948).

It is not for us to pass upon the numerous factual and legal issues as though we were trying the cases *de novo.* "It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end." *Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. [523], at 564 [63 S.Ct. 727, 749, 87 L.Ed. 959].

---

21. For three security issues, two of the PFW&C and one of Penn Central, no valid ballots were cast.

*New Haven Inclusion Cases*, 399 U.S. 392, 435, 90 S.Ct. 2054, 2081, 26 L.Ed.2d 691 (1970); *see also In re Penn Central Transportation Co.*, 454 F.2d 9, 13 (3d Cir. 1972).

### A.

None of these appellants attacks the basic structure of the Plan. They wish to stay within its existing framework, but seek to secure slightly better treatment than it presently affords. As we have noted, the Plan accommodates a complex series of compromises affecting the rights of numerous classes of claimants with various priorities of claims. Many of the compromise agreements will expire by their own terms if the Plan is not consummated in 1978. The complete collapse of the Plan, necessitating a return to the drawing board for a new plan, would place an even more crushing burden on the parties to this litigation. Judge Fullam's opinion accompanying the approval order thoughtfully and extensively analyzes the issues and tribulations that will be avoided if the present Plan is effectuated.

The Plan classifies all claimants in fifteen categories, denominated Classes A through O. Appellants are pre-bankruptcy secured creditors, members of Class J, the tenth rank. Only the prodigious compromises affecting the nine higher classes render this plan feasible in any respect, and it must be emphasized that appellants challenge their treatment *within* Class J, not the ranking of Class J within the overall hierarchy created by the Plan. The appellants ask that we apply the absolute priority rule, *Northern Pac. Ry. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Group of Institutional Investors v. Chicago, M., St. P. & Pac. R. R.*, 318 U.S. 523, 542, 63 S.Ct. 727, 87 L.Ed. 959 (1943), as we must, but that we interpret it differently than did the reorganization court.

### B.

The operative effect of the absolute priority rule is described in 6A Collier on Bankruptcy, Par. 11.06, at 210–11 (14th ed. 1977):

Under the absolute priority rule, a plan is not "fair and equitable" unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Any arrangement by which a junior class receives values allocable to a senior class "comes within judicial denunciation." Beginning with the top-most class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate.

But this rule, as is the case of any legal precept, must be considered in the context of the facts at issue. The doctrine of precedent does not command that general rules, once properly determined, be applied blindly in later cases. As succinctly explained by Professor Edward H. Levi, "the scope of a rule of law, and therefore its meaning, depends upon a determination of what facts will be considered similar to those present when the rule was first announced. The finding of similarity or difference is the key step in the legal process." [22]

This court, as did the reorganization court, recognizes that no single precedent or group of precedents can provide precise guidance in this case because of the unique facts that have no precise counterpart in our legal tradition. The normal priority rules that apply to secured creditors must not be considered *in vacuo*. Throughout these proceedings, the absolute, or mechanical nature of orthodox rules of priority must always be viewed in accordance with the circumstances. The command of the rule must serve the reality of the fact.

And the brooding omnipresence that dominated the creation of the Plan, that permeated the jural atmosphere of the reorganization court, and is present here, is the recognition of fundamental, immutable

---

**22.** Levi, *An Introduction to Legal Reasoning*, 15 U.Chi.L.Rev. 501, 502 (1948).

facts: Penn Central's (1) monumental debt to the United States of more than a half billion dollars which has a statutory right to first priority on payment; (2) unpaid pre-petition taxes due state and local authorities; and (3) staggering administrative expenses. These massive claims all precede the demands of secured creditors. Because of such claims, the value of the collateral securing the claims of Class J creditors is relatively diminished. Our construction and application of precedents such as the absolute priority rule must necessarily take account of the unique facts of this Plan and proceed in an environment pervaded more by relativity than by absolutes.

## VI.

We first address the question whether the Plan, in providing Series A preference stock to certain bondholders whose mortgage liens were recognized by the reorganization court to have somewhat superior coverage, the super-secured creditors, adequately provides for them.

## A.

Irving Trust Company serves as trustee of two collateral trust indentures securing some $15 million principal amount of New York Central and Penn Central bonds due in 1990 and 1993. We will consider in this opinion Irving's appeals relating to these collateral trust indentures. Irving also appeals from the Plan's treatment of the Mohawk and Malone bondholders. That appeal is discussed in a separate opinion filed this date, the *Irving Trust and Bank of New York Appeals*.[23] To secure payment of the principal and interest on the New York Central and Penn Central bonds, Irving holds approximately 160,000 shares of the capital stock of the Pittsburgh and Lake Erie Railroad Company (P & LE). The bonds are further secured by over $8 million principal amount of New York Central Railroad Company Refunding and Im-

provement Mortgage 5% Bonds (R & I bonds).

PCTC's petition for reorganization constituted a default under the terms of the indentures which would have empowered Irving to dispose of the P & LE stock and the R & I bonds held as collateral and to apply the proceeds to discharge PCTC's indebtedness to Irving, were it not for the reorganization court's prohibition of such disposition by Order No. 1 entered on June 21, 1970. Pursuant to subsequent orders of the reorganization court, dividends paid on the P & LE stock have been utilized to pay a portion of the interest due Irving on the 1990 and 1993 bonds, so that there is presently about $700,000 unpaid interest.

The PCTC trustees have valued the P & LE stock at $100.15 per share, and expert testimony placed the value at $107.50 based on market quotations in May 1977, II, A–127. The outstanding $275 million of R & I bonds are secured by retained assets valued by the reorganization court at $99 million, giving the bonds a face value equal to 35.9% of their principal amount without making any allowance of an allocable portion of Valuation Case proceeds.

The foregoing figures support the reorganization court's finding that

[t]wo collateral trust issues, the New York Central 6% bonds of 1990 (approximately 113% to 119% retained asset coverage) and the Penn Central 6½% bonds of 1993 (approximately 123% to 131% retained asset coverage), also have "super secured" status. In both cases, stock of the Pittsburgh & Lake Erie Railroad is the primary security.

458 F.Supp. at 1291 (footnote omitted).

Irving argues that the reorganization court erred in its treatment of the bondholders in two respects. First, the inclusion of *all* pre-bankruptcy secured creditors in Class J ignores "substantial differences in priorities, claims [and] interests" among the various creditors, in violation of Section

---

**23.** Although this opinion adjudicates the claims presented by Irving Trust as Indenture Trustee for the New York Central and Penn Central bondholders, it will be necessary to address these same claims in the companion opinions filed today in the *Irving Trust and Bank of New York Appeals*. *See, inter alia*, Part I.B.

77(c)(7), 11 U.S.C. § 205(c)(7). Second, despite the "super secured" status of the bondholders and their consequent preferential treatment, their compensation under the Plan is not the equitable equivalent of the rights surrendered and thus violates the Bankruptcy Act and the absolute priority rule.

### B.

Title 11 U.S.C. § 205(c)(7) provides in pertinent part:

(7) The judge shall promptly determine and fix . . . for the purposes of the plan and its acceptance, after notice and hearing, the division of creditors and stockholders into classes according to the nature of their respective claims and interests. Such division shall not provide for separate classification unless there be substantial differences in priorities, claims, or interests.

The last sentence of this provision was added as part of a 1935 amendment and was expressly intended to reverse the trend toward the recognition of many classes of creditors—particularly of secured creditors. *See* 79 Cong.Rec. 13764 (1935) (remarks of Senator Wheeler, sponsor of the statutory amendments); *id.* at 13298–99 (remarks of Rep. Summers, the House sponsor); Fuller, *Background and Techniques of Equity and Bankruptcy Railroad Reorganizations—A Survey,* 7 Law & Contemp.Prob. 377, 390–91 (1940) ("The amended statute was designed to discourage such over-classification."). The experience which contributed most significantly to the amendment was the Section 77 reorganization of the Missouri Pacific Railroad Company, in which the court designated 55 classes of creditors. Secured creditors were separately classified not only by mortgage, but by bond issue; at least one class consisted of a single creditor. The number of classes was later reduced to

24. *Missouri Pac. R. R. Co. Reorg.,* 239 I.C.C. 7, 28–32 (1940); *Missouri Pac. R. R. Co. Reorg.,* 290 I.C.C. 477, 482–83 (1954), *In re Missouri Pac. R. R. Co.,* 39 F.Supp. 436, 450 (E.D.Mo.1941).

■ But even if secured creditors had been divided into separate classes as appellants argue should have been done, Section 77(e) requires only that the court

is satisfied and finds, after hearing, that [the plan] makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan [otherwise satisfied the requirements of Section 77(e), para. 1].

Any differences among the members of Class J are relatively insignificant, and under the applicable statutory test, should not result in the division of Class J into separate classes for voting purposes.[24] We hold that the court correctly declined to stratify the secured creditors into further minute categories based on a detailed examination of their collateral, and that the two objecting creditors had no right to separate classification.

### C.

Supplementing the Fifth Amendment standard of just compensation as it applies in bankruptcy proceedings, *see In re Penn Central Transportation Co.,* 494 F.2d 270, 278 (3d Cir. 1974), are the statutory requirements of 11 U.S.C. § 205(e)(1), that a plan must be "fair and equitable" and must afford "due recognition to the rights of each class of creditors and stockholders," as well as the judicially created absolute priority rule. The rule is that "each security holder in the order of his priority receives from that which is available for the satisfaction

24. Even if the contention of Irving were accepted, the results of the voting would not be any different for purposes of the confirmation of the Plan. If the four bond issues found by the reorganization court to be "super-secured" (Mohawk and Malone, the two P & LE Collateral Trust Indentures and the Gold Bonds) were considered to be a separate class, the results would be that 94 percent of those bondholders voting have accepted the Plan. Supplemental Report of United States Trust Co. dated June 8, 1978; Tables V–3, V–5, V–8, V–25, V–26 at 14, 16, 19, 36, 37.

of his claim the equitable equivalent of the rights surrendered. That requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old." *Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 565–66, 63 S.Ct. 727, 749, 87 L.Ed. 959 (1943). Irving contends that there is a "woeful inadequacy" in the value of its new securities under the Plan in comparison with the securities surrendered.

■ By applying record evidence as to the value of the securities in the 10 triple 30 distribution package, Irving asserts that the present value of those securities can be estimated to be between 44 and 58 cents on each dollar of its claim. In addition, although the surrendered P & LE shares pay dividends sufficient to service the interest requirements of the Irving bonds, the substituted 10 triple 30 securities, with the exception of the 10% cash payment, are non-income producing property. It is Irving's position that its treatment under the Plan squarely violates the following language of *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 527–29, 61 S.Ct. 675, 686, 85 L.Ed. 982 (1941):

> The bondholders for the principal amount of their 6% bonds receive an equal face amount of new 5% income bonds and preferred stock, while the preferred stockholders receive new common stock. True, the relative priorities are maintained. But the bondholders have not been made whole. They have received an inferior grade of securities, inferior in the sense that the interest rate has been reduced, a contingent return has been substituted for a fixed one, the maturities have been in part extended and in part eliminated by the substitution of preferred stock, and their former strategic position has been weakened. Those lost rights are of value. Full compensatory provision must be made for the entire bundle of rights which the creditors surrender.
>
> . . . Thus it is plain that while creditors may be given inferior grades of

securities, their "superior rights" must be recognized. Clearly, those prior rights are not recognized, in cases where stockholders are participating in the plan, if creditors are given only a face amount of inferior securities equal to the face amount of their claims. They must receive, in addition, compensation for the senior rights which they are to surrender. If they receive less than that full compensatory treatment, some of their property rights will be appropriated for the benefit of stockholders without compensation. That is not permissible.

We note, however, that in the same opinion, the Court stated:

> The absolute priority rule does not mean that bondholders cannot be given inferior grades of securities, or even securities of the same grade as are received by junior interests. Requirements of feasibility of reorganization plans frequently necessitate it in the interests of simpler and more conservative capital structures. And standards of fairness permit it. This was recognized in *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445 [46 S.Ct. 549, 70 L.Ed. 1028]. This Court there said ([271 U.S.] p. 455 [46 S.Ct. p. 551, 70 L.Ed. 1028]) that though "to the extent of their debts creditors are entitled to priority over stockholders against all the property" of the debtor company, "it does not follow that in every reorganization the securities offered to general creditors must be superior in rank or grade to any which stockholders may obtain. It is not impossible to accord to the creditor his superior rights in other ways."

*Id.* at 528, 61 S.Ct. at 686 (footnote omitted). The Court provided further elaboration of the principles underlying application of the absolute priority rule at 529–30, 61 S.Ct. at 386, 387 (footnote omitted):

> Practical adjustments, rather than a rigid formula, are necessary. The method of effecting full compensation for senior claimants will vary from case to case. As indicated in the *Boyd* case (228 U.S. at p. 508 [33 S.Ct. at p. 561, 57 L.Ed. 931])

the creditors are entitled to have the full value of the property, whether "present or prospective, for dividends or only for purposes of control," first appropriated to payment of their claims. But whether in case of a solvent company the creditors should be made whole for the change in or loss of their seniority by an increased participation in assets, in earnings or in control, or in any combination thereof, will be dependent on the facts and requirements of each case. So long as the new securities offered are of a value equal to the creditors' claims, the appropriateness of the formula employed rests in the informed discretion of the court.

The Circuit Court of Appeals, however, made certain statements which if taken literally do not comport with the requirements of the absolute priority rule. It apparently rule[d] that a class of claimants with a lien on specific properties must receive full compensation out of those properties, and that a plan of reorganization is *per se* unfair and inequitable if it substitutes for several old bond issues, separately secured, new securities constituting an interest in all of the properties. That does not follow from *Case v. Los Angeles Lumber Products Co., supra.* If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of "fair and equitable" are satisfied.

Any other standard might well place insuperable obstacles in the way of feasible plans of reorganization.

Irving is not objecting to its treatment vis-a-vis the shareholders but to its treatment vis-a-vis other secured creditors. The reorganization court in this case did not err in limiting Irving's compensation to securities constituting an interest only in the properties as to which Irving's prior liens existed.

The Plan treats the claims of all Class J creditors as fully secured and gives all members of the class the same types of securities. The Plan's primary distinction among secured creditors is to award Series A general mortgage bonds for claims secured by retained assets and B bonds for claims secured by assets conveyed to Conrail. Series A bonds are to be redeemed with the proceeds of the already proceeding asset disposition program, whereas B bonds will be redeemed primarily with the proceeds of the Valuation Case. A secondary distinction has been created, however, which affects the priority of redemption of 30% of each claim—that which has been satisfied by preference stock. This stock, in a total amount of approximately $550 million, is to be redeemed from proceeds of the Valuation Case and the profits of the reorganized company beginning in 1982; redemption priority is to be determined by lot. However, certain claimants, including Irving as indenture trustee for the New York Central and Penn Central bondholders, by virtue of their extraordinarily strong security, were granted Series A preference stock which is to be redeemed in full prior to redemption by lot of the Series B preference stock. Because the A preference stock aggregates less than 10% of all the preference stock, its redemption is expected to be quicker and surer than that of the B preference stock. As a super-secured creditor, Irving thus receives significantly better treatment than other members of Class J, and we hold that equitable equivalence has been maintained.

#### D.

■ We readily acknowledge the unusually strong security underlying Irving's claim. But that strength is recognized and compensated by Irving's classification as a super-secured creditor and its receipt of Series A preference stock. We cannot accept, however, Irving's contention that it is "secured by a pledge of stock which is not subject to any conflicting claims or liens." Brief of Appellant Irving Trust Company, as Indenture Trustee, at 31. What this argument fails to recognize is the unfortunate reality that there is *nothing* in the debtor's estate which is not subject to any conflicting claims or liens.

Nine classes of claimants precede the pre-bankruptcy secured creditors. At least a billion dollars of higher priority claims prime the claims of the secured creditors, including those of Irving.[25] If there is now no "conflicting claim or lien" against the P & LE stock, it is because the highest priority creditors have compromised their claims for truly monumental debts. Needless to say, Irving does not object to those accommodations. Yet the same treatment of Irving's claim appears to be unsatisfactory. At bottom, Irving's attack on the "fair and equitable" nature of its compensation under the Plan must fail because it assumes that the value of the pledged securities prior to reorganization equals the face value of the P & LE stock and the R & I bonds. Proceeding from that premise, it is evident that Irving's new securities in the 10 triple 30 package have a lower present value than the surrendered securities. But what is being surrendered by Irving is not the face value of those securities—it is that value less whatever might be taken by the government and the myriad other prior claimants if this Plan were to fail and if every litigable claim were to be contested to its fullest extent.

Even if we accept Irving's valuation of its new securities as being worth approximately 50 cents on each dollar of its claim, it does not follow that Irving is receiving half of what it is surrendering. The interest of Irving in the surrendered P & LE stock and the R & I bonds cannot be equated with the full face value of those securities; the value of Irving's interest must be reduced by the vulnerability of the securities to prior administration claims. It is impossible to place an exact dollar amount on the value of Irving's interest, but in deciding whether Irving's compensation was "fair and equitable," the reorganization court correctly considered the relevant legal criteria. As in assessing the fairness of a compromise, see *Protective Committee v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), the reorganization court apprised itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimated the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the securities. These are considerations directly affecting the worth of Irving's interest in the collateral securing the indentures. Although they cannot be quantified with any exactitude, the threats of invasion by nine classes of higher prior claimants shroud Irving's "super" security. After a full discussion of the foregoing considerations, the court concluded that Irving's argument

> focuses upon the uncertain value of the proposed new securities, but . . . assumes that [its] own claims are unassailable. This results in a distorted comparison between the claims surrendered and the benefits which would be received. . . . This argument assumes all of the benefits of the Plan (the compromises with the Government, the bank group, the New Haven Trustee, and the taxing authorities) for purposes of valuing the claims at full value, but assumes that the Valuation Case will make no contribution whatever to the value of the common stock of the reorganized company . . . [Irving's argument] presents the same question under a different guise, namely, should a plan be attempted now, or should the results of the Valuation Case be awaited? This is perhaps the only question as to which there appears to be unanimous agreement:
>
> Everyone, including the super secured claimants, recognizes the desirability of achieving a plan now, rather than awaiting further developments.
>
> Thus, the immediate issue is whether the risks, uncertainties and possible benefits of the Valuation Case litigation, and the consequences of the RRRA process, are being fairly apportioned in the distributions proposed in the Plan. I am satisfied that the allocations are fair and equitable.

---

**25.** For a detailed discussion of the impact of these administrative claims, see *Irving Trust and Bank of New York Appeals* filed this date, Part I.B. 3.

458 F.Supp. at 1301–02. We, too, are convinced that the bondholders represented by Irving are fairly and equitably compensated under the Plan. The value of their interest in the surrendered securities is substantially reduced by potential litigation of prior claims; the securities they will receive in the 10 triple 30 package enhanced by super-secured status sufficiently compensate them for what is due under the mandate of the absolute priority rule.

### VII.

Three other appellants, also pre-bankruptcy secured creditors who are members of Class J, challenge their treatment under the Plan, contending that the 10 triple 30 distribution package is not the fair and equitable equivalent of the securities they will surrender if the Plan is consummated. These appellants are the Wilmington Trust Company, the Manufacturers National Bank of Detroit and Charles S. Jeffrey. We will first outline the interests and claims of the appellants separately, and then, because of the substantial identity of the issues they raise, address the issues as they relate to the appellants collectively.

Wilmington is trustee for the Michigan Central Collateral Indenture (MCC indenture) secured by stock of the Michigan Central Railroad Company and by a second lien on Park Avenue properties. The face value of Wilmington's claim is presently $21.8 million including principal and interest. This claim is secured by the pledge of 168,-000 shares of Michigan Central stock, valued by PCTC trustees and the reorganization court at $25.2 million, 458 F.Supp. at 1291. As additional security for the MCC indenture, Wilmington shares with Manufacturers a second lien on the Park Avenue properties. The Park Avenue properties are valued at $236 million; after satisfaction of the prior Gold Bond mortgage, there are some $139 million of retained assets securing Wilmington's and Manufacturers' combined $41.6 million claim.

Nevertheless, Wilmington is not classified as a super-secured creditor, because for purposes of super-security, the Plan recognizes only first liens. The result is that although the Park Avenue properties are worth $236 million, subject to the Gold Bond mortgage of $97 million, the "excess" value of $139 million is not marshalled down to second-level indentures for the purpose of awarding Series A preference stock as super-secured creditors. In the allocation of preference stock, only Wilmington's first lien on the MCC stock merits consideration, so Wilmington's security is only slightly greater than 100% and Wilmington's distribution under the Plan is Series B preference stock.

Anomalously, however, the Plan distributes Series A or B general mortgage bonds based only on the distinction between whether a claimant's securities are among the assets retained by the reorganized company or whether the assets were conveyed to Conrail. This part of the distribution takes no account of the amount or strength of the underlying security; for distribution of general mortgage bonds, all Class J creditors are treated as fully secured, and the only inquiry is whether the assets were retained or conveyed.

Thus, Wilmington is in no better position in the allocation of general mortgage bonds than a creditor whose very weak securities were retained, and for the allocation of preference stock, Wilmington fares worse than some claimants with far less total security merely because part of Wilmington's claim is secured by a second lien—regardless of the fact that the first lien leaves a huge excess of value that could be applied to Wilmington's claim. In short, Wilmington claims that although the securities available under the Plan are appropriate, the formula used to allocate those securities does not adequately distinguish the relative positions of the creditors and is thus not fair and equitable. Wilmington contends that its compensation should consist of 10% payment in cash and 90% payment in Series A bonds.

Manufacturers Bank is trustee for the Lake Shore Collateral Indenture which has a claim in the face amount of $19.8 million. Part of the security for this indenture consists of operating rail assets which were

conveyed to Conrail. In addition to the conveyed assets, however, Manufacturers' indenture is jointly secured with the MCC indenture by a second lien on Park Avenue properties and other retained assets with a combined value of more than $300 million. Because the first lien on these properties is only around $100 million, the combined $41.6 million claims under the MCC and Lake Shore indentures are secured by the remaining $200 million value of these retained assets. Manufacturers thus asserts the same inequity urged by Wilmington based on the Plan's method of allocation of general mortgage bonds and preference stock. Manufacturers seeks payments of 10% in cash, 60% in A bonds and 30% in new common stock. It asserts a right to an extra 30% of A bonds rather than preference stock because the 10 triple 30 distribution package fails to differentiate among the various priorities of liens against retained assets which secure the claims of various creditors. Its high priority claims should result in new securities with high priority redemption, rather than the standard package distributed to Class J claimants in general.

Appellant Jeffrey is an individual holder of $204,000 in Michigan Central bonds. His claim is identical to that of Wilmington in all material respects, Brief of Appellant Charles S. Jeffrey at 12–13.

These appellants contend that the Plan is not fair and equitable as applied to them. They base their argument on case law requiring certain factual findings which were not made by the reorganization court. In part, they challenge the findings of fact which were made. They challenge the logic employed by the reorganization court in analyzing the various claims of the secured creditors, urging that various alternative approaches to the analysis of competing claims would be more appropriate and would require that they receive better treatment. They suggest that the 10 triple 30 package does not adequately differentiate between junior and senior creditors, in effect arguing that the Plan must have more than the present number of creditor classes. Finally, and alternatively, they

claim entitlement to super-secured status as a minimal recognition of the superiority of their security in comparison to other members of Class J. Without some readjustment of the Plan to reflect the strength of the collateral securing their claims, they insist that the Plan fails to satisfy the statutory and equitable mandates governing reorganization proceedings.

### A.

Various aspects of the Plan which are under attack by these appellants have already been discussed at length. Assumptions basic to the Plan are: that the Valuation Case will produce a recovery sufficient to satisfy the claims of all secured creditors; that the far-reaching compromises of the highest priority creditors are fair and equitable and work to the benefit of all creditors; that it is impossible to place a dollar value on the outcome of the Valuation Case; that in the absence of the compromises embodied in the present Plan, there is no claim which is not subject to dispute which could only be resolved by lengthy and expensive litigation; that to effectuate a plan now is in the best interest of all claimants.

■ We have emphasized the unique nature of this proceeding. There are two faces to this consideration. First, every railroad reorganization is unique; the proceedings are equitable in nature and peculiar problems and claims invariably demand the attention of a reorganization court. Beyond the statutory requirement that a plan of reorganization be fair and equitable, there is little that may be regarded as absolute in the law governing railroad reorganizations. For example, we have alluded to the relativity demanded in applying the absolute priority rule. We decline to adopt a mechanical application of any of the embellishments, clarifications, extensions, derivatives or off-shoots of the rule which have been so strenuously urged by the appellants.

Recognizing the equitable considerations and unique problems inherent in all reorganization proceedings, we are compelled to

observe that some reorganizations have more specialized characteristics than others. Distinguishing this proceeding from all prior cases are a number of factors which require careful analysis in order to determine the weight and effect to be given to pronouncements of prior courts in bankruptcy cases. For one thing, there are no prior cases wherein a national transportation crisis led to a congressional mandate that the debtor continue operation long after it became obvious that it could not successfully reorganize, leading in turn to the creation of a special court to determine the extent of unconstitutional erosion of the estate caused by the mandatory deficit operations. Nor are there prior cases in which similar policies regarding the national transportation system led Congress to require the conveyance of a huge bulk of property without any prior evaluation, necessitating the special court to determine its value after the conveyance, in litigation expected to require ten more years. The sheer size of the expenses of administration, the unprecedented scope and number of compromises preceding adoption of the Plan, and legislative intervention are all factors which require a unique approach to the weighing of the equities underlying the claims against PCTC.

### B.

Appellants argue that *Consolidated Rock Products Co. v. Du Bois, supra,* 312 U.S. at 527–28, 61 S.Ct. 675, requires that a value be placed on the rights surrendered as the first step in determining whether the securities allocated under the Plan are the equitable equivalent of the old. They also state that the court erred in failing to apply marshalling principles to their collateral in order to ascertain the value of the rights they surrender under the Plan. Similarly, it is argued that the court erred in treating all Class J creditors as fully secured. Admitting the impossibility of anticipating the ultimate award which will eventually emanate from the Valuation Case, appellants contend nevertheless that a present value may be assigned to the securities representing the proceeds of the Valuation Case, that

expert testimony of that value was presented to the court, and that the court was required to make a finding of the value but erroneously failed to do so. Finally, appellants challenge their exclusion from the group of super-secured creditors who are entitled to receive preferential treatment in the allocation of preference stock.

■ Initially we note that *Consolidated Rock, supra,* does not establish a *per se* requirement that a monetary value be placed on the rights surrendered by a creditor in a reorganization.

It is said that *Consolidated Rock Co. v. Du Bois,* 312 U.S. 510 [61 S.Ct. 675, 85 L.Ed. 982], forbids the substitution of an approved capital structure for determinations of value. In that case there was no finding of the values of the property involved and this Court said: "Absent the requisite valuation data, the court was in no position to exercise the 'informed, independent judgment' (*National Surety Co. v. Coriell,* 289 U.S. 426, 436 [53 S.Ct. 678, 77 L.Ed. 1300]) which appraisal of the fairness of a plan of reorganization entails," [312] page 520 [61 S.Ct. 675]. . . . There is nothing, however, in the *Du Bois* case to indicate that dollar valuations of the property or claims are essential for recapitalization or the distributions of securities in reorganizations. The defect in *Du Bois* was not the failure to find dollar values but the failure to find the worth of the security behind independent mortgages on distinct properties and of assets subject to the claims of particular groups of creditors. Such findings were required in that case because the court was dealing with a parent and two subsidiaries with inter-company accounts. Each subsidiary entity had its own creditors. The system was a unified operation and we held the claims against the subsidiaries had priority over stockholders equity in the parent, p. 523 [61 S.Ct. 675]. Without a separate valuation of assets, it was impossible to tell what assets of the parent were left to form the basis for the securities distributed to the parent's stockholders. In *Du Bois,* as

here, the manner of reaching that valuation, so long as it complies with the statutory standards, is not important. There are subsidiaries here but there are no claimants of the subsidiaries looking to the parent. The aggregate of the authorized securities in the present case is to be equitably distributed among claimants against a single corporation. Findings were made as to the property covered by the different mortgages of the debtor and securities allocated on the basis of that finding. . . . Under such circumstances the lack of a valuation in dollars is immaterial.

*Ecker v. Western Pacific R.R.,* 318 U.S. 448, 482–83, 63 S.Ct. 692, 711–12, 87 L.Ed. 892 (1943) (citations omitted). The Court further elaborated on the requirements of valuation in applying the absolute priority rule:

> But at any rate, under the absolute priority rule . . . the stratification of securities issued to creditors need not follow invariably the relative priority of the claimants. Apropos of a somewhat similar situation, we said in *Consolidated Rock Co. v. Du Bois,* 312 U.S. at p. 530 [61 S.Ct. 675]:
>
> "If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of 'fair and equitable' are satisfied."

*Id.* at 484, 63 S.Ct. at 712–13 (footnotes and citations omitted). We take this to mean that the necessity of placing a dollar amount on a creditor's collateral, as well as the securities substituted therefor, are matters to be determined under the circumstances of each case.

In this reorganization, placing a value on the rights surrendered by appellants is impossible. The securities they hold can be evaluated, but their vulnerability to prior administration claims would require the extensive, destructive litigation the reorganization court has sought so assiduously to avoid. Without the Plan, there would be no reorganization. Liquidation of retained assets would take years or decades; allocation of administration expenses would be disputed at every juncture; interest on prior claims would soar into the hundreds of millions. These facts are not denied by appellants. They recognize their benefit from the implementation of *some* plan now. They simply seek somewhat stronger substitute securities than the 10 triple 30 package affords. Thus they presented their "best case" and "worst case" analyses, their liquidation analogies and their alternative disposition schemes, all of which were considered by the reorganization court. The result is that they failed to establish their entitlement to better treatment, and their presentation of the same arguments to this court is no more convincing.

Appellants refer to their "seniority" as secured creditors. Their position is that, under any set of circumstances, their claims would be paid in full out of retained assets. Wilmington Brief at 26; Manufacturers Brief at 30. The reorganization court's opinion treats this contention in great detail at 458 F.Supp. 1290–1300 and we are satisfied that it was correctly rejected. The reorganization court had good reason to place all secured creditors in Class J. With nine classes of prior claimants, and every asset of the debtor subject to unpredictable prior claims, there is no way to establish the relative priorities of the secured creditors without litigation of every potential claim. In short, what appellants seek is the benefit of every compromise which makes the Plan possible without accepting any of the burdens. They seek an ex parte determination of all litigable claims in order to establish their right to better treatment.

■ We find no error in appellants' exclusion from the group of super-secured creditors. Their principal argument is that the excess value of assets securing first liens on retained property should be marshalled down to subsequent liens for the purpose of determining super-security. Aside from the conceptual difficulties en-

gendered by adopting this approach, the suggested revision would defeat the purpose of the recognition of super-secured status.

There is a logical inconsistency in finding the first lienor, the Gold Bond mortgage, with a claim of $97 million secured by assets of $236 million, to be 243% secured, then to apply marshalling principles to the $139 million excess in order to evaluate the claim of the second lienor. In this case, the $139 million excess would render appellants 394% secured, but that would leave the first lienor only 100% secured. Similarly, the excess value which appellants want to use to establish their super-security would have to be marshalled down to third lienors, leaving appellants only 100% secured.

More fundamentally, the problem with the approach is that the court granted this preferential allocation of stock to the small group of recipients precisely because of the uncertainty of the contingent aspects of this reorganization. A "worst case" liquidation analysis suggests the possibility that only first lienors secured by assets substantially in excess of 100% of their claim would be fully compensated. In such an eventuality, there would be no excess assets to secure the claim of the holder of a second lien. The concept of marshalling in this limited context is therefore inappropriate because the minor preference granted the super-secured creditors exists solely to recognize their unique position—which is not shared by holders of subordinate liens.

We hold, therefore, that the reorganization court correctly found the compensation of appellants under the Plan to be the equitable equivalent of the rights surrendered, after an informed evaluation of the reasonable range of potential litigation possibilities affecting appellants' rights in their collateral.

## VIII.

Our final appeal is that of the Erie and Kalamazoo Railroad Company (E & K).[26] In contrast to the other appellants, E & K does not challenge its treatment under the Plan—it objects to the Plan's failure to make any provision with respect to its administration claim. Because we find no error in confirmation of the Plan notwithstanding its exclusion of E & K, we affirm.

E & K is one of several non-bankrupt independent railroad companies which leased lines to Penn Central prior to reorganization. E & K filed a claim against the debtor for the use and occupancy of its properties during the period of reorganization in the amount of $496,000, a claim which, if allowed by the court, would be treated as a Class G administration claim. In contrast to the leased lines in bankruptcy, the secondary debtors, and other non-bankrupt leased lines which are subsidiaries of Penn Central, the Plan makes no specific provision for the independent non-bankrupt lines like E & K. Rather, it contemplates resolution by settlement or future adjudication by the reorganization court; because of pending settlement negotiations between the PCTC trustees and representatives of the leased lines, and because of difficult legal issues implicated by the leased lines' claims, the court deemed it preferable to proceed with the Plan now and to save resolution of these claims for another day. It did so on the understanding that

> the Plan would [not] be impaired by the failure of the non-bankrupts to join in the Plan. The Trustees have offered evidence that the feasibility of the Plan would not adversely be affected by the failure to have these matters resolved before consummation, and no one has challenged that conclusion.

26. The Clerk was informed by letter of May 26, 1978 that the Mahoning Coal Railroad Company and the Mahoning and Shenango Valley Railway Company (collectively, Mahoning), appellants in No. 78–1711, intended to file a joint brief with E & K, appellant in No. 78–1710. Mahoning's subsequent motion for exemption from the briefing schedule in light of a potential settlement agreement was granted on June 21, 1978. E & K filed its brief independently, and Mahoning never filed a brief. Mahoning is also a non-bankrupt lessor to the Penn Central; thus we believe its objections to the Plan are adequately addressed in this section.

458 F.Supp. at 1261. The court noted that "the eventual resolution of the disputes between the reorganized company and the non-bankrupt lessors may be either more or less favorable to the Trustees" than the terms on which the Plan resolves the claims of the secondary debtors and the subsidiary leased lines. *Id.*

Most leased lines, including the bankrupts and subsidiaries, had claims against the estate which were offset by cross-claims for operating losses during the period of reorganization. In most instances involving lines which have been included in the Plan, resolution of the conflict involves mutual cancellation and discharge of the claims and cross-claims with some individual adjustments related to tax liabilities, bond claims and other factors differing as to specific leases.

The claim of E & K is also countered by the trustees' claim for operating losses, and negotiation of the claims has failed to reach settlement. Thus, under the terms of the Plan, E & K may continue to negotiate with the trustees, or it may seek adjudication by the reorganization court, and the resolution of the dispute "may be either more or less favorable" than those of the other leased lines.

### A.

E & K asserts that the Plan is not fair and equitable because it discriminates against E & K in failing to resolve its claim while including provisions governing other leased lines. It argues that it is injured by the Plan's failure to reserve securities to satisfy its claim, should the claim ultimately be allowed by the court. By contrast, in those instances where the Plan calls for substantial consideration to be awarded to certain leased lines, Section 10.3 of the Plan requires that:

> The Reorganized Company will reserve for issuance, in accordance with the terms of the Plan . . . the maximum amounts of securities required . . . .

Appellant argues that such discrimination is without basis in the record and is not predicated on "substantial differences in priori-

ties, claims, or interests" as required by 11 U.S.C. § 205(c)(7). In addition, it asserts that it was denied its right to a hearing on its objections in violation of 11 U.S.C. § 205(e).

Appellant's second major argument is that the Plan violates the absolute priority rule which requires that "senior claims *first* receive securities of a worth sufficient to cover their face and interest *before* junior claims receive anything." *Ecker v. Western Pacific R.R., supra,* 318 U.S. at 483, 63 S.Ct. at 712 (emphasis added). Because E & K's claim, if allowed, would be a Class G administration claim, it argues that it must receive recognition prior to the satisfaction of junior claims.

### B.

We do not agree that the Plan unfairly discriminates against E & K. The record is clear that different factors justify different treatment of independent non-bankrupt lessors than is accorded the secondary debtors and the lines owned by the PCTC. It was essential that the Plan deal conclusively with the latter claims because they had a significant effect on the capital structure of PCTC. The same is simply not true of independent claimants whose claims may be satisfied in money or securities of the reorganized company. Nor do we share E & K's concern that there was no explicit reservation of securities to satisfy its claim. The claim, if allowed in full, is less than a half million dollars; we note that that amount may be partially or entirely offset by the trustees' cross-claim. In the context of this multi-billion dollar reorganization, we think it self-evident that "the feasibility of the Plan would not adversely be affected by the failure to have these matters resolved before consummation." Having found no unfair discrimination against E & K, we cannot accept its argument that it has been divided into a "separate classification" without "substantial differences in priorities, claims, or interests" in violation of 11 U.S.C. § 205(c)(7). To the extent its claim is allowed, it will be classified in one of the existing classes of creditors. Finally,

the assertion that the Bankruptcy Act was violated by the court's failure to hold a hearing on E & K's objections to the Plan is likewise without merit. Title 11, U.S.C. § 205(e) requires a hearing prior to approval of a plan if a party in interest files objections to the plan. E & K was entitled to participate in the extensive hearings on the objections to the Plan; indeed, counsel for E & K acknowledged that the trustees "encouraged" E & K's participation. Vol. V, A–106. That E & K's position was not adopted by the court or implemented in the plan is not equivalent to a failure to conduct the statutorily required hearings.

■ Accepting E & K's premise that its claim is an expense of administration which remains unsatisfied while the claims of junior creditors have been paid pursuant to the consummation order, we nevertheless perceive no violation of the absolute priority rule. Appellant's characterization of the rule as a temporal concept is not helpful. What is required is that provision be made for satisfaction of senior claims prior to satisfaction of junior claims; clearly it is immaterial in what order creditors physically receive their compensation under the plan. So long as the Plan provides sufficient flexibility to satisfy whatever portion of appellant's claim as is ultimately approved, the absolute priority rule is not offended. The trustees concede and the court recognizes that appellant's claim must be resolved, that it must be classified, and that it must be satisfied in accordance with the appropriate classification. What is relevant here is that the disputed claim is so small in comparison to the size of the debtor's estate that it borders on the absurd to suggest that the Plan cannot incorporate whatever portion of the claim may be adjudged to be valid.

Accordingly, we reject appellant's contentions that the Plan is not fair and equitable and that it violates the absolute priority rule.

## IX.

Henry Thoreau, in another context, observed that "[w]e do not ride on the railroad; it rides upon us." [27] It may be that many Penn Central creditors now share that view.

Nevertheless, as to these appellants we find no error of law or clearly erroneous findings of fact that would justify reversals of the orders of the reorganization court. As Judge Fullam stated, the Plan is a "monumental achievement," 458 F.Supp. at 1346, "an important milestone in the long and tortuous struggle" to reorganize the embattled Penn Central, *id.* We agree with the reorganization court that the Plan provides entirely fair and workable solutions to the complex and difficult problems confronting the debtor's estate. Accordingly, we will affirm the orders of approval, confirmation and consummation of the Plan.

## OPINION ON PETITION FOR REHEARING AND REHEARING EN BANC

### PER CURIAM.

We have before us petitions for panel rehearing and rehearing en banc filed by the Wilmington Trust Company, indenture trustee for the Michigan Central Collateral Bonds, and Manufacturers National Bank of Detroit, indenture trustee for the Lake Shore Collateral Bonds. While their arguments differ in their details, the thrust of the claims is identical. Both indenture trustees rely upon the holding of this court in the R & I appeal that rental income from the Park Avenue properties which had been diverted to pay operating expenses during the reorganization remained subject to the lien of the R & I mortgage and must therefore be recognized in the Plan's allocation of reorganization securities to R & I bondholders. That holding, the indenture trustees contend, increases by approximately $60,000,000 the value of the assets that are subject to their senior mortgages on the same properties. The effect of this substantial increase in the value of those assets, they argue, is to increase the likelihood

27. H. Thoreau, *Walden*, Ch. II, Where I Lived, and What I Lived For (1854).

that the assets securing their claim would have survived a litigated liquidation. Therefore, under the logic of our opinion in the *Irving Trust Appeals*, the distributions to them under the Plan must be increased to meet the requirements of the absolute priority rule.

 We have no occasion to consider the merits of these claims. In this appeal neither the Wilmington Trust or Manufacturers National Bank made any objection in their briefs or at oral argument to the diversion of the Park Avenue rentals, even to the extent of adopting by reference the arguments made by the Bank of New York on behalf of the R & I bondholders. Nor did either indenture trustee rely upon the availability of such assets in the extensive liquidation analyses presented to this court. Manufacturers National Bank of Detroit argues that the failure to raise or even hint at the indenture trustees' objection to the diversion of the Park Avenue rentals was intended to avoid wasteful duplication of argument on appeal. Our examination of the reorganization court record, however, discloses that even in that court neither trustee objected to the treatment of the Park Avenue rentals or mentioned their relevance to their proposed liquidation analyses either in their final statement of objections to the Plan *or* in the briefs which they filed in opposition to the Plan. Having failed to raise this issue at any prior stage of the proceedings, these trustees may not at this late date claim that the failure of the reorganization court to consider the value of Park Avenue rentals in the liquidation analysis of their claims was error. The petition for rehearing is therefore denied.